# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  23-00068-01-CR-W-HFS |
| | ) | |
| AHMAD R. RHODES, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending is Defendant Ahmad R. Rhodes's Motion to Suppress Evidence, which was filed on June 13, 2023.  Doc. 22.  For the reasons set forth below, the undersigned recommends Defendant's motion to suppress be **DENIED**.

## I.      BACKGROUND

On April 4, 2023, the grand jury returned an indictment charging Defendant with possession with intent to distribute forty grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possession with intent to distribute fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  Doc. 12. The alleged charges involve controlled substances and a firearm law enforcement seized from Defendant on March 20, 2023.

In the pending motion to suppress, Defendant argues he was unlawfully detained when he was told not leave the encounter with law enforcement, he was not advised of his *Miranda* rights

before he made a statement, and his post-arrest consent to search was coerced. Doc. 22. For these reasons, he moves to suppress the evidence seized and a statement he made to law enforcement.

On August 3, 2023, the undersigned held an evidentiary hearing on Defendant's motion to suppress. Docs. 32, 34. Defendant was present and represented by counsel, Assistant Federal Public Defender Angela Williams. *Id.* Assistant United States Attorneys Megan Baker and Ashleigh Ragner represented the Government. *Id.* At the hearing, two witnesses testified: Collin Love and Antonio Garcia. *Id.* In addition, four exhibits were admitted. Docs. 32, 37. On August 10, 2023 and August 15, 2023, the parties filed supplemental briefing on Defendant's motion to suppress. Docs. 35, 36.

## II.      FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1.      The Missouri Western Interdiction and Narcotics Task Force ("MoWIN"), which is comprised of several law enforcement agencies, focuses on stopping the flow of illegal narcotics into Kansas City. Doc. 34 (hereinafter, "Transcript" or "Tr.") at 5-7, 56. MoWIN concentrates on certain modes of transportation, such as buses,[1] originating from United States cities located close to Mexico, which is the source of most narcotics in the United States. Tr. at 7-9, 56-57, 61-62. These "source" cities include but are not limited to Los Angeles, Las Vegas, Phoenix, and Dallas. Tr. at 8-9, 11-12, 56-57.

2.      On the morning of March 20, 2023, MoWIN conducted interdiction enforcement at the Greyhound Bus Station located at 1101 Troost Avenue, Kansas City, Missouri. Tr. at 5-8,

---

[1] In law enforcement's experience, traffickers use the bus system to transport narcotics because identification is not required to travel, passengers do not walk through body scanners, and luggage is not searched or x-rayed. Tr. at 10-11, 60-62.

46-47, 60.  MoWIN members, including Jackson County, Missouri Sheriff's Office ("JCSO") Detective Collin Love[2] and Kansas City, Missouri Police Department ("KCPD") Detective Antonio Garcia,[3] wore plain clothes, and their badges and firearms were concealed.  Tr. at 16-17, 24, 66-67.  Around 8:00 a.m., a bus originating from Los Angeles and ultimately bound for New York arrived at the Kansas City bus station.  Tr. at 9-11, 30, 45, 60-61, 78.  Upon arriving, all passengers disembarked for the bus to be cleaned and refueled.  Tr. at 9-10, 12, 62.

3.  Detective Garcia deployed K-9 Zeus to conduct a sniff check of the bus's lower luggage compartment.  Tr. at 12-13, 44, 62-63, 78-79.  Zeus is certified to alert to marijuana, cocaine, methamphetamine, and heroin.  T. at 58-59.  While conducting the sniff check, Zeus alerted to the odor of narcotics on a black and white checker patterned suitcase (hereinafter, "suitcase").  Tr. at 13, 44, 63-64, 79.  The suitcase was removed from the luggage compartment and placed on the platform near the front of the bus.  Tr. at 13-15, 44, 63-64, 79.

4.  Once the passenger compartment was empty, Detective Garcia took Zeus through the bus's interior for a sniff check.  Tr. at 14, 44, 64.  Zeus alerted to the odor of narcotics on a Herschel backpack with a camouflage pattern (hereinafter, "backpack").  Tr. at 15, 44, 64-65, 79.  The backpack was removed from the bus and set by the suitcase on the platform.  Tr. at 13-15, 44, 65, 79.  The backpack and suitcase were isolated from other luggage to assist law enforcement in identifying the owner(s).  Tr. at 13-15, 64-65.

5.  After the suitcase and backpack were placed on the platform, Detective Love went inside the bus station lobby to see if anyone claimed the bags.  Tr. at 15-16, 45.  Eventually,

---

[2] Detective Love has twenty-two years' law enforcement experience.  Tr. at 5-6.  For the past three years, he has been a member of MoWIN where he has been involved in more than 100 narcotics investigations.  Tr. at 6-8.

[3] For more than twenty-six years, Detective Garcia has served in law enforcement.  Tr. at 55-56.  He has been a member of MoWIN for twenty-one years during which he has been involved in nearly 1,000 narcotics investigations.  Tr. at 56-57.

Detective Love saw a person approach the suitcase and backpack. Tr. at 17-18, 45; Gov't Ex. 3 at 09:08:48 – 09:08:52.[4] The individual, later identified as Defendant, was wearing a sweatshirt, coat, and beanie hat. Tr. at 17, 21, 48, 67. He also had a camouflage patterned fanny pack slung over his shoulder. Tr. 17, 21, 33, 48, 67-68, 89.

6.      As Defendant reached for the backpack, Detective Love approached Defendant, displayed his badge, and identified himself as a police officer. Tr. at 17-18, 45, 80; Gov't Ex. 3 at 09:08:51 – 09:08:59. Detective Garcia stood a short distance away to ensure Detective Love's safety during his interaction with Defendant. Tr. at 23-24, 46, 49, 66-68, 80; Gov't Ex. 3 at 09:08:57 – 09:11:32.

7.      Detective Love asked Defendant if the backpack belonged to him. Tr. at 18. Defendant answered in the affirmative. Tr. at 18. The detective informed Defendant a K-9 alerted to the backpack. Tr. at 18. He asked Defendant if he was carrying illegal narcotics, firearms, or large sums of currency. Tr. at 18-20, 45. Defendant said he had a small amount of marijuana in his backpack. Tr. at 19, 45-46.

8.      The detective asked for Defendant's consent to search the backpack and conduct a pat down search of his person. Tr. at 20, 46, 48. Defendant consented to both requests. Tr. at 20-21.[5] Before performing the pat down search, Detective Love asked Defendant to remove his coat and fanny pack. Tr. at 21, 48.[6] Defendant complied with the request, placed his coat on a bench, and put his fanny pack under the coat. Tr. at 21-22, 48, 67-68, 81; Gov't Ex. 3 at 09:10:06 –

---

[4] Government Exhibit 3 is the bus station's video surveillance of law enforcement's contact with Defendant near the bus. Tr. at 73-74. According to Detective Garcia, the video's timestamp is roughly one hour ahead of when the interaction occurred. Tr. at 74-75. He also testified sunlight caused "a glare on the camera lens," making it difficult to see the recording. Tr. at 75.

[5] According to Detective Love, he wanted to perform a pat down search for weapons to ensure the safety of officers and others in the area. Tr. at 20-21.

[6] The detective requested Defendant remove his coat to prevent Defendant from accessing his coat pockets, and he asked Defendant to remove the fanny pack because the detective planned to ask for consent to search it. Tr. at 21.

09:10:17. Based on their training and experiences, Detective Love and Detective Garcia believed Defendant was trying to conceal the fanny pack under his coat. Tr. at 21, 48. The pat down search revealed no weapons or contraband on Defendant's person. Tr. at 22, 49, 52, 81, 87; Gov't Ex. 3 at 09:10:18 – 09:10:24.

9.  After the pat down search, Defendant began to walk away from Detective Love. Tr. at 22-23, 50, 69, 82; Gov't Ex. 3 at 09:10:24 – 09:10:30. The video surveillance shows Defendant had his coat when he began to walk away.[7] Gov't Ex. 3 at 09:10:24 – 09:10:30. Detective Love told Defendant he needed to stay, and Defendant complied with the directive. Tr. at 23, 50-51, 69, 82; Gov't Ex. 3 at 09:10:31 – 09:10:33. According to Detective Love, Defendant was detained and not free to leave at that time. Tr. at 23, 51.

10.  While Detective Love began searching the backpack, Defendant sat on the bench where he had placed his coat and fanny pack. Tr. at 22-23, 70, 82. Detective Garcia noticed Defendant attempted to sit on top of his coat. Tr. at 70, 89. And Detective Love observed Defendant "stuff" the fanny pack "underneath the coat next to him." Tr. at 22. Both detectives, based on their training and experiences, thought Defendant was still trying to hide the fanny pack. Tr. at 22, 70, 84.

11.  Because he previously interacted with bus passengers who carried a firearm in a readily accessible bag, Detective Garcia became concerned the fanny pack contained a weapon. Tr. at 24, 68-71, 83-84, 87, 89. He approached Defendant, identified himself, and displayed his badge. Tr. at 24-25, 69, 71, 82-83. According to Detective Garcia, Defendant immediately attempted to reach for the fanny pack when he approached Defendant. Tr. at 69, 71. Detective

---

[7] Due to the poor quality of the video surveillance, it is unclear if Defendant was also carrying his fanny pack when he attempted to walk away.

Garcia told Defendant not to reach for the fanny pack and asked Defendant if he could search the fanny pack. Tr. at 24, 51, 69, 71, 82-83. Defendant denied the request. Tr. at 24, 51, 71, 83.

12.  Detective Garcia offered for a K-9 to sniff the fanny pack.[8] Tr. at 24-25, 51, 71-72, 89. Defendant did not answer Detective Garcia's question. Tr. at 25, 72. Instead, he continued to reach for the fanny pack and said there was a gun in it. Tr. at 25, 52, 72, 83. Because Defendant said there was gun in the fanny pack, and he had access to it, the officers attempted to handcuff Defendant for officer safety and the safety of others at the bus station. Tr. at 25, 52, 72-73. Although Defendant initially struggled with officers, he was eventually handcuffed. Tr. at 25, 52-53, 72-73; Gov't Ex. 3 at 09:11:01 – 09:12:28. Less than five minutes elapsed between Detective Love's initial contact and Defendant being handcuffed. Gov't Ex. 3 at 09:08:51 – 09:12:28.[9]

13.  Once handcuffed, officers escorted Defendant to an office inside the bus station. Tr. at 25-26, 53, 73, 75, 87. Defendant's backpack and fanny pack were also brought to the office. Tr. at 26. Once in the office, Detective Love asked Defendant if he had any other luggage. Tr. at 27. In addition to the fanny pack and backpack, Defendant advised he had a black and white suitcase, a brown and black suitcase, and a black Adidas bag. Tr. at 27, 31; *see also* Gov't Ex. 1. Officers recovered Defendant's other bags. Tr. at 27.

14.  Detective Love gave Defendant a form requesting permission to search his belongings. Tr. at 27-29, 53; Gov't Ex. 1.[10] He also read the form to Defendant. Tr. at 28-30; Gov't Ex. 1. Defendant was uncuffed, and he signed the consent form at 8:29 a.m. Tr. at 29-31;

---

[8] Although Detective Garcia testified consent was not required for a dog sniff, he offered the alternative "to make it as consensual as we [could] at the time." Tr. at 71-72.

[9] Detective Love estimated seven or eight minutes elapsed between his initial contact with Defendant and when Defendant was handcuffed. Tr. at 25. But the surveillance video reveals the encounter lasted less than five minutes. The timeframe provided by Detective Love was an estimate and does not cause the undersigned to question the detective's credibility.

[10] The detective presented the form to Defendant because he preferred to have a signed consent form in light of Defendant's actions – i.e., "resisting detention, not submitting to being handcuffed." Tr. at 28.

Gov't Ex. 1. He was then handcuffed again. Tr. at 30. No promises were made to Defendant when he was asked for his consent. Tr. at 32. According to Detective Love, Defendant neither revoked his consent nor indicated he had changed his mind about consenting to the search. Tr. at 32.

15. Outside of Defendant's presence, law enforcement searched his belongings. Tr. at 31-32, 53; Gov't Ex. 1. The officers found, among other things, a loaded revolver, more than 60 grams of methamphetamine, more than 330 grams of M30 pills[11] believed to contain fentanyl, marijuana, a digital scale, currency, and packaging supplies. Tr. at 33-34, 76-77; Gov't Ex. 1; Doc. 1-1 at 4-5.

16. At approximately 8:43 a.m., Detective Love advised Defendant of his *Miranda* rights by reading KCPD's Miranda Warning and Waiver (hereinafter, "*Miranda* waiver"). Tr. at 34-35, 53; Gov't Ex. 2; Gov't Ex. 4 at 00:00 – 00:33.[12] He then asked Defendant if he understood what was read to him. Gov't Ex. 4 at 00:33 – 00:34. Defendant said he did. Gov't Ex. 4 at 00:34 – 00:44. And Detective Love understood that Defendant agreed to speak with him. Tr. at 36. Defendant remained handcuffed while the *Miranda* waiver was read to him. Tr. at 35-36; Gov't Ex. 2. The detective kept Defendant handcuffed and did not ask for his signature in part due to his behavior after he signed the consent form – that is, he kept "standing up and sitting down." Tr. at 35-36.

17. The interview lasted less than fifteen minutes. Tr. at 39; Gov't Ex. 4. Based on his training and experience, Detective Love did not suspect Defendant was intoxicated or under the influence of any substance during their interaction. Tr. at 54; *see also* Gov't Ex. 4. Detective

---

[11] The M30 pills – or counterfeit pills designed to look like M30 pills – were packaged in sets of ten, which, based on Detective Love's training and experience, was consistent with distribution. Tr. at 33.

[12] Government Exhibit 4 is a recording of the interview. Tr. at 39.

Love testified he had no difficulty communicating with Defendant during their interaction and found Defendant answered questions appropriately.  Tr. at 36-37, 54; *see also* Gov't Ex. 4.

18.      During the interview, Defendant lamented, "why now?  Why couldn't you all do it when I was high?"  Tr. at 37; Gov't Ex. 4 at 12:09 – 12:12.  He also told the officers he had an opioid "problem" and directed them to "gimme some drugs please."  Gov't Ex. 4 at 02:11 – 02:18, 04:20 – 04:22.

19.      When interviewed, Defendant provided his name, date of birth, height and weight, social security number, the state in which he was born, current address, the security code for his cell phone, his phone number, his mother's name, the name of the college he attended, and the year he attended college.  Gov't Ex. 4 at 01:01 – 01:06, 01:11 – 01:13, 01:19 – 02:10, 02:54 – 03:00, 03:11 – 03:30, 03:47 – 03:59, 06:37 – 07:01.  When asked about his travel plans, Defendant stated he was travelling from Colorado to visit his mother in Kentucky.  Gov't Ex. 4 at 07:42 – 07:57.

20.      Defendant also told officers he had an ounce of methamphetamine, 3,200 fentanyl pills, and $800 in his fanny pack.  Tr. at 37-39; Gov't Ex. 4 at 08:38 – 09:22, 10:18 – 10:27.  He admitted he was a felon and disclosed he failed to appear for a sentencing hearing, which resulted in a warrant being issued for his arrest.  Tr. at 41; Gov't Ex. 4 at 10:44 – 11:11.

21.      Upon reviewing Defendant's criminal record, Detective Love learned Defendant had an "extensive history of drugs" and "an active federal warrant out of Colorado."  Tr. at 40-41.  Based on Defendant's criminal record and his cordial, non-combative demeanor during the interview, the detective concluded Defendant was "familiar with dealing with law enforcement."  Tr. at 36-37, 40-41.

22.     According to Detective Love, had he not found any contraband items in the backpack he searched or the fanny pack he intended to search, he would have run Defendant's identification before "let[ting] him go." Tr. at 21, 41-42. Had Defendant's name been run, the detective would have discovered the active arrest warrant and placed Defendant under arrest. Tr. at 42. Upon his arrest, Defendant's coat and fanny pack would have been searched incident to arrest. Tr. at 42-43.

23.     The entire interaction between law enforcement and Defendant took less than one hour. Gov't Ex. 3 at 09:08:51 – 09:12:28; Gov't Ex. 4. At no point during the interaction did any officer brandish a weapon. Tr. at 32.

## III.     DISCUSSION

Defendant presents three arguments in his motion to suppress. *See* Doc. 22. First, he contends he was unlawfully detained when Detective Love told him to stay. *Id*. at 6-13.[13] Second, Defendant argues law enforcement failed to read him his *Miranda* rights once he was in custody. *Id*. at 14-16. Third, he maintains his post-arrest written consent to search was coerced. *Id*. at 17-19. The Government argues Defendant was not under arrest; rather, officers had reasonable suspicion to conduct an investigative stop. Doc. 28 at 5-7. It also asserts *Miranda* was not implicated during the investigative stop. *Id*. at 7-8. Finally, the Government claims Defendant knowingly and voluntarily consented to a search of his belongings. *Id*. at 8-14.[14]

---

[13] The Court cites the pagination CM/ECF automatically applies to filings.

[14] The Government raises two alternative arguments. Specifically, it contends (1) if law enforcement did not have reasonable suspicion to detain Defendant, his statement and the seized contraband are immune from suppression under the attenuation doctrine, and (2) the evidence would have been inevitably discovered and should not be excluded. Doc. 35 at 2-5. Defendant contends the attenuation and inevitable discovery doctrines do not apply to the facts before the Court. Doc. 36 at 1-2, 5-11. In light of the recommendations herein, the undersigned does not address the Government's alternative arguments.

## A.     Defendant's Detention

The Fourth Amendment specifically provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  Whether the Fourth Amendment is implicated depends on the nature of the encounter between law enforcement and a citizen.  *See United States v. Mendenhall*, 446 U.S. 544, 553-55 (1980); *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968).  The Eighth Circuit recognizes three types of police-citizen encounters: a consensual encounter, a *Terry* stop, and a full-scale arrest.  *United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988).

Defendant concedes his encounter with law enforcement up to and including the pat down search was consensual.  Doc. 22 at 6; Tr. at 90-92.  After the pat down search, Defendant began to walk away, but Detective Love told Defendant to stay.  The Government argues that, at this point, Defendant was lawfully detained under a *Terry* stop.  Doc. 28 at 5.  But Defendant maintains he was under arrest, and law enforcement did not have probable cause to arrest him.  Doc. 22 at 9.

According to the Eighth Circuit Court of Appeals, "[t]here is no clear line between investigative stops and de facto arrests."  *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016) (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)).  "A de facto arrest occurs when the officer's conduct is more intrusive than necessary for a *Terry* investigative stop."  *Id*. at 712-13 (quoting *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994)).  Before addressing the evidence presented in this matter, the Court outlines the requirements and parameters of a *Terry* stop, and when a *Terry* stop becomes an arrest.

### (1)     *Terry* Stop

A brief investigative, or *Terry*, stop is permitted when law enforcement has reasonable, articulable suspicion that the person stopped is, or is about to be, engaged in criminal activity.  *See*

*United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020). Reasonable suspicion does not require "absolute[] certain[ty];" rather, an officer must observe "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 27-30. Reasonable suspicion requires more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause. *Kansas v. Glover*, 140 S. Ct. 1183, 1187-88 (2020); *United States v. Sanchez*, 955 F.3d 669, 674-75 (8th Cir. 2020). Additionally, reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citation omitted).

In determining whether officers have reasonable suspicion, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citation omitted); *see also Arvizu*, 534 U.S. at 273. Courts consider "what the officer reasonably knew at the time, rather than assessing the existence of reasonable suspicion with the vision of hindsight." *Slater,* 979 F.3d at 629 (internal quotations and citation omitted). When assessing the overall level of suspicion, courts may not view individual elements of suspicion in isolation but must view the elements in context and give due weight to the officer's inferences. *Sanchez,* 955 F.3d at 675. The Government has the burden of proving the officer had reasonable suspicion that criminal activity was afoot, not that the subject of the stop was actively engaged in a crime. *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016).

An individual is "not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). This temporary detention allows officers "to determine the suspect's

identity or to maintain the status quo while obtaining more information." *United States v. Horton*, 611 F.3d 936, 941 (8th Cir. 2010) (citation omitted); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (citation omitted). Officers must use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Newell,* 596 F.3d 876, 879 (8th Cir. 2010) (citation omitted); *see also Martinez*, 462 F.3d at 907 (handcuffing the defendant "was a reasonable response . . . to protect the officers' personal safety and to maintain the status quo," and thus, did not convert the *Terry* stop into an arrest).

**(2)     When a *Terry* Stop Becomes an Arrest**

If a *Terry* stop lasts for "an unreasonably long time or if officers use unreasonable force," the stop may become an arrest, which requires probable cause. *United States v. Hawkins*, 830 F.3d 742, 745 (8th Cir. 2016) (citation omitted). To establish a *Terry* stop was unreasonably prolonged, a defendant must show the officers "detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *United States v. Donnelly*, 475 F.3d 946, 951-52 (8th Cir. 2007) (citation omitted). When determining whether a *Terry* stop has become an arrest, courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspects]." *Irvin v. Richardson*, 20 F.4th 1199, 1207 (8th Cir. 2021) (quoting *United States v. Sharpe,* 470 U.S. 675, 686 (1985)). Several factors are considered:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) (quoting *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021)).

### (3)    Whether Defendant Was Subjected to a *Terry* Stop or Arrested

As Detective Love began to search Defendant's backpack, Defendant began to walk away from the detective. Detective Love told him to stay, and Defendant complied. Defendant claims he was unlawfully arrested when he was directed to stay in the area. The Government contends Defendant was subjected a lawful *Terry* stop. To properly consider these arguments, the Court must examine the circumstances leading up to his detention.

The record establishes MoWIN members were conducting interdiction enforcement at the bus station on the morning of March 20, 2023. The bus on which Defendant was a passenger originated in Los Angeles – a city MoWIN identifies as a source of narcotics to the Kansas City area. During a sniff check of the bus's lower luggage compartment, K-9 Zeus alerted to the odor of narcotics on a suitcase. Then, during a sniff check of the passenger compartment, Zeus alerted to a backpack. The suitcase and backpack were placed on a platform near the front of the bus in an attempt by law enforcement to identify the owner(s).

Eventually, Defendant approached the items. Detective Love, who was wearing plain clothes, contacted Defendant, who said the backpack was his. The detective notified Defendant that a K-9 alerted to his backpack, and he asked Defendant if he was carrying any illegal narcotics, firearms, or large sums of money. Defendant stated his backpack contained a small amount of marijuana. Detective Love then asked Defendant for consent to search his backpack and conduct a pat down search of his person. He consented to both. Before the pat down search, Defendant removed his coat and attempted to hide his fanny pack under the coat. After the pat down search

was conducted, Defendant took his coat off the bench and began to walk away. Detective Love told Defendant to stay, and he complied.

Up to this point, the detective was the only officer to interact with Defendant. The detective began his search of the backpack, for which Defendant gave his consent. Defendant sat on a bench next to his coat and fanny pack and continued to attempt to hide his fanny pack with the coat. He was not handcuffed. Other officers, also in plain clothes, were present but further away during this interaction. Law enforcement did not use force to make Defendant stay, and no one brandished a firearm.

Based on the totality of the aforementioned circumstances, the undersigned recommends a finding that law enforcement had a reasonable, articulable suspicion of criminal activity, and thus, was justified in temporarily detaining Defendant to conduct a *Terry* stop. Detective Love quickly and diligently pursued the investigation of Defendant. Up until the time Defendant was told to stay, less than two minutes elapsed. The investigation consisted of law enforcement asking Defendant a few questions and searching his backpack, which Zeus identified as containing narcotics. The investigatory means were likely to confirm or dispel law enforcement's suspicion that the backpack and/or suitcase contained narcotics. During this short timeframe, it was necessary to detain Defendant, and unreasonable force was not used to detain him. Based on the foregoing evidence, the undersigned recommends the Court find Defendant was subjected to a lawful *Terry* stop, and the stop did not become an arrest when he was instructed to stay.[15]

---

[15] Defendant argues *Reid v. Georgia*, 448 US. 438 (1980), is "not meaningfully distinguishable from this case," and thus, his motion to suppress should be granted. Doc. 22 at 12-13. In *Reid*, the Supreme Court held law enforcement could not have "reasonably suspected the petitioner of criminal activity" based on an airline passenger appearing to fit a "so-called drug courier profile"; arriving early in the morning and from Fort Lauderdale, which was identified as "a principal place of origin of cocaine sold elsewhere in the country"; appearing to conceal that he was traveling with another individual; and having no luggage other than shoulder bags. *Id*. at 440-41. Unlike the case before this Court, *Reid* did not involve a K-9 positively alerting to luggage, the individual stating the luggage was his, the individual admitting he had marijuana in one bag, and the individual taking measures to hide a fanny pack under his coat. Accordingly, *Reid* is readily distinguishable from the circumstances before this Court.

**B.      Defendant's Statement Before Being Read His *Miranda* Rights**

Defendant moves to suppress his statement that he had a gun in his fanny pack.  Doc. 22 at 14-16.  He argues officers elicited the statement from him after he was placed under arrest.  *Id*.  The United States Constitution protects individuals from self-incrimination.  U.S. Const. amend. V.  Before a suspect in custody is interrogated, law enforcement must warn him that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

**(1)      Custody**

Generally, to determine whether someone is "in custody" for *Miranda* purposes, courts consider "the totality of the circumstances confronting the defendant at the time of the interview," and "whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest."  *United States v. Muhlenbruch*, 634 F.3d 987, 995-96 (8th Cir. 2011) (citation omitted); *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003) (citation omitted).  As discussed *supra*, section III(A)(3), the evidence supports a finding that Defendant was detained for a *Terry* stop.  Although an individual is not free to leave a *Terry* stop, the Eighth Circuit has declared *Miranda* warnings are not necessary for persons detained for a *Terry* stop.  *Pelayo-Ruelas*, 345 F.3d at 592 (citation omitted).  Accordingly, the undersigned recommends the Court find the administration of *Miranda* warnings was not necessary before Defendant made his statement about having a gun in the fanny pack and deny Defendant's motion to suppress this statement.

Moreover, while Defendant was told to stay while Detective Love searched Defendant's backpack, his freedom of movement was not constrained to the degree of a formal arrest.  In fact,

he sat on a bench next to his belongings. He was not handcuffed or otherwise forcibly restrained at that time. For these additional reasons, the undersigned recommends the Court conclude Defendant was not in custody for purposes of *Miranda* and deny his motion to suppress his statement about having a gun in his fanny pack.

### (2) Interrogation

If the Court concludes Defendant was in custody when he made the statement, the undersigned recommends the Court find Defendant was not interrogated. Under *Miranda*, interrogation includes "express questioning" and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005) (quoting *Innis,* 446 U.S. at 301). Whether an officer's statement constitutes interrogation depends on the circumstances in the matter and is determined from the suspect's perspective, not the officer's intent. *Hull*, 419 F.3d at 767; *see also Innis*, 446 U.S. at 301. When a defendant moves to suppress a custodial statement made before *Miranda* rights are given, the Government must prove by a preponderance of the evidence that law enforcement's failure to provide the warnings "was not part of a deliberate attempt to circumvent *Miranda*," and the defendant's statement was voluntary. *United States v. Everett*, 245 F. Supp. 3d 1101, 1113 (W.D. Mo. 2017) (citing *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011)).

According to the record before the Court, when Detective Love began searching Defendant's backpack, Detective Garcia believed Defendant was trying to conceal his fanny pack, and he became concerned the fanny pack contained a gun. This prompted Detective Garcia to ask Defendant if he could search the fanny pack. After Defendant declined consent, the detective

offered for a K-9 to sniff the fanny pack.  Immediately thereafter, Defendant spontaneously said he had a gun in the fanny pack.

Setting aside whether Detective Garcia was required to do so,[16] his offer for a K-9 to sniff Defendant's fanny pack is akin to a request to search the fanny pack.  The Eighth Circuit has routinely held a request to search does not constitute interrogation, and thus, does not require *Miranda* warnings.  *See, e.g.*, *United States v. Tapia-Rodriguez*, 968 F.3d 891, 895 (8th Cir. 2020) (citation omitted); *United States v. Saenz*, 474 F.3d 1132, 1136-37 (8th Cir. 2007) (citation omitted).  In addition, Detective Garcia's offer was not intended and was not reasonably likely to elicit an incriminating response.  *See Tapia-Rodriguez*, 968 F.3d at 895 (finding police's request for consent to search a room was not interrogation); *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836-37 (8th Cir. 2014) (finding an officer inquiring about the defendant's immigration status did not motivate the defendant's incriminating statement about a gun).[17]  Moreover, there is no evidence that law enforcement's failure to provide *Miranda* warnings was part of a deliberate attempt to circumvent *Miranda*.

Based on the foregoing circumstances and the applicable legal authority, the undersigned recommends a finding that Detective Garcia's offer for a K-9 to sniff Defendant's fanny pack did not constitute interrogation, and *Miranda* warnings were not required.

### (3)    Volunteered, Non-Responsive, and/or Spontaneous Statement

Even if the Court were to conclude Defendant was in custody and the detective's offer of a K-9 sniff constituted interrogation, the undersigned would still recommend Defendant's motion

---

[16] Defendant does not raise any issue with Detective Garcia offering a K-9 to sniff the fanny pack other than arguing the offer elicited an incriminating statement.  *See* Doc. 22 at 14-16.

[17] Tellingly, Defendant does not argue Detective Garcia's initial request to search the fanny pack constituted interrogation.  *See* Doc. 22 at 14-16.  If the request to search was not interrogation, it is unclear as to how the detective's subsequent offer for a K-9 to sniff the fanny pack is interrogation.

to suppress his statement be denied. *Miranda* does not protect a defendant from making statements that are volunteered, non-responsive to interrogation, and/or are spontaneous. *See United States v. Harris*, 64 F.4th 999, 1002 (8th Cir. 2023) (citation omitted); *Crisolis-Gonzalez*, 742 F.3d at 837 (citation omitted). Defendant concedes a suspect's volunteered statement is not the product of police interrogation, and thus, is not barred by the Fifth Amendment. Doc. 22 at 15.

Defendant's statement about having a gun in the fanny pack was not responsive to Detective Garcia's offer for a K-9 to sniff the fanny pack. Much like the detective's previous request to search the fanny pack, the K-9 sniff offer did not elicit anything other than Defendant's consent or non-consent. Regardless of Defendant's consent or non-consent, that statement would have fallen outside of the Fifth Amendment's protections and would not have been incriminating. *See Hall v. Iowa*, 705 F.2d 283, 289 n.4 (8th Cir. 1983) (citation omitted) (giving consent to search is not an incriminating statement); *United States v. Calvetti*, 836 F.3d 654, 663 (6th Cir. 2016) ("Consenting to a search is . . . not the type of statement that falls within the protections of the Fifth Amendment.").

Instead, the circumstances reveal Defendant volunteered he had a gun in the fanny pack. His statement did not respond to the detective's question. Rather, it was a spontaneous statement. For these additional reasons, the undersigned recommends the Court find Defendant's statement was volunteered, non-responsive, and/or spontaneous and deny his motion to suppress the statement.

## C.     Post-Arrest Search of Defendant's Belongings

Finally, Defendant maintains his post-arrest written consent to search his belongings was coerced, and therefore, not lawful. Doc. 22 at 17-19. To protect citizens from unwarranted government intrusion, the Fourth Amendment's reasonableness requirement generally requires

officers obtain a judicial search warrant, issued only upon a showing of probable cause, before searching private property. *See Riley v. California*, 573 U.S. 373, 381-82 (2014) (citations omitted). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). Voluntary consent to a search is an exception to the warrant requirement. *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973)).

To establish voluntary consent to a search, "the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). An individual voluntarily consents to a search if, by words and conduct, he causes a "reasonable person to believe" he "has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Cedano-Medina*, 366 F.3d at 684-85; *see also Esquivias*, 416 F.3d at 700. "The ultimate question is whether the individual's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." *United States v. Johnson*, 956 F.3d 510, 516 (8th Cir. 2020) (citation omitted).

When determining if an officer reasonably believed an individual knowingly and voluntarily consented to a search, courts consider the totality of the circumstances. *See Saenz*, 474 F.3d at 1137. The Eighth Circuit categorizes these factors as (1) the nature of the interaction

between law enforcement and the defendant,[18] (2) the defendant's personal characteristics,[19] and (3) the environment surrounding the defendant when consent was given.[20]  *Garcia-Garcia*, 957 F.3d at 897 (citation omitted).  "The factors should not be applied mechanically, and no single factor is dispositive or controlling."  *United States v. Escobar,* 389 F.3d 781, 785 (8th Cir. 2004) (citation omitted).

Defendant claims his post-arrest written consent to search was involuntary because it "was coerced by the police.  Doc. 22 at 17.[21]  He asserts "[t]he police broke [his] will . . . through a procedure used to intentionally coerce and overcome his will."  *Id*. at 19.  He argues officers obtained his consent "after the police *told* [Defendant] that the dog would sniff his backpack *and* placed him in handcuffs."  *Id*.  The evidence presented at the suppression hearing, however, established Detective Garcia offered a K-9 sniff of the fanny pack after Defendant refused to provide consent for a search of his fanny pack.  There was no evidence the detective <u>told</u> Defendant a K-9 would sniff his backpack or fanny pack.

While Defendant was later handcuffed when asked for consent to search his belongings, "being in handcuffs, under arrest, or in custody does not preclude a finding of voluntariness." *United States v. Magallon*, 984 F.3d 1263, 1281 (8th Cir. 2021) (citation and internal quotation marks omitted).  Being handcuffed, under arrest, or in custody is only one of several factors considered when determining whether consent was voluntary.  *See id*. (citation omitted).  The

---

[18] When evaluating the nature of the interaction, courts consider, among other things, the length of time the individual was detained and/or questioned before giving consent, whether law enforcement made promises or misrepresentations, and whether the individual was threatened, punished, or physically intimidated.  *See United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006).

[19] A defendant's personal characteristics include, *inter alia*, age, intelligence, education, sobriety, experience with law enforcement, and whether the individual objected to the search or was silent while the search was conducted.  *See id*.

[20] Environmental factors include, among other things, whether the individual was under arrest or in custody and whether the request to search and consent thereto occurred in a public or secluded place.  *See id*.

[21] Defendant does not argue his consent was involuntary due to other factors – e.g., age, mental ability, education, intoxication, or being under the influence of a controlled substance.  *See* Doc. 22 at 17-19.

Court must also consider that Defendant has some college education, he did not appear to be intoxicated or under the influence of a controlled substance, he had prior experiences with law enforcement, he appeared to be generally knowledgeable of his rights when he initially refused a request to search the fanny pack, he was detained for a short period of time before being asked for consent to search his belongings, and his consent was requested and given in private. Additionally, no promises were made to Defendant, and there is no evidence that law enforcement threatened him, made misrepresentations, or were physically abusive or intimidating in any way. When considering the totality of the circumstances, Defendant's will was not overborne, and his capacity for self-determination was not impaired. Further, a reasonable person would have believed Defendant knowingly and voluntarily consented to the search. For these reasons, the undersigned recommends the Court find Defendant voluntarily consented to the search of his belongings and deny his motion to suppress the evidence found during the search.

## IV.    CONCLUSION

Based on the foregoing, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress Evidence (Doc. 22).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: September 20, 2023                   _/s/ W. Brian Gaddy_____
                                          W. BRIAN GADDY
                                          UNITED STATES MAGISTRATE JUDGE